No. 91-556

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

BERNICE MATHES, GEORGE LaVOIE,
PETE SKELSKY, RICHARD SCHWARZ,
CORA LINN, NORRIS AMUNDSON,
DORIENNE AMUNDSON, TOM TALARICO,
SHERYL MANGINELLI, and HAROLD
MANGINELLI,

       Plaintiffs and Appellants,

-vs-

BILL ADAMS and HAROLD MAGRUDER,

       Defendants and Respondents.

FILED

AUG 1 8 1992

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable Jack L. Green, Judge presiding.

COUNSEL OF RECORD:

    For Appellants:

        Klaus D. Sitte, Montana Legal Services Association,
        Missoula, Montana
        Norris Amundson, Pro Se, Missoula, Montana

    For Respondents:

        Christopher B. Swartley, Datsopoulos, MacDonald &
        Lind, Missoula, Montana

Submitted on Briefs:  April 15, 1992

Decided:  August 18, 1992

Filed:

Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from the Fourth Judicial District Court, in and for the County of Missoula, the Honorable Jack L. Green presiding. Appellants were all tenants of a Missoula trailer court at one time or another. They appeal the decision of the District Court which held that the landlords did not breach the warranty of habitability. We reverse.

This action began in 1983 when Bill Adams and Harold Magruder (landlords) purchased a Missoula trailer court known as the "River Road Trail Court." Mervin Brandvold (Brandvold) became the on-site manager and leased mobile home spaces to numerous individuals, some of whom are the appellants (tenants) in this action. Shortly after purchasing the trailer court the landlords made promises to reseed lawns and pave streets, neither of which was done. They also made various rules for the trailer court and its residents which went unenforced over the course of several years; the manager actually participated in breaking the rules.

The tenants experienced various maintenance problems the most serious to include garbage accumulation due to inadequate collection services, septic system overflows and backups, and a contaminated water system. The tenants complained regularly, resulting in little or no action from the landlords or Brandvold.

In 1985, the landlords decided to build a townhouse development on the trailer court site and submitted proposals to that end with the appropriate authorities. To accomplish the project, eviction of the trailer court tenants would be necessary.

2

As consideration of the townhouse development progressed, the tenants continued to be plagued with severe problems with the water and sewer systems as well as garbage collection and general cleanliness of the common areas of the trailer court.

At one point a "boil order" was levied due to a contaminated water sample test obtained by the Missoula City-County Health Department (Health Department). It was not uncommon that raw sewage spilled out onto the ground and sewer risers on vacant trailer spaces had loose fitting caps or were left uncapped completely. Little or no effort was made to clean up the spills leaving a detestable odor throughout the trailer court, particularly in warm weather.

Eventually, landlords withdrew the proposed townhouse development and the property continued to be utilized as a trailer court. Complaining tenants were often met with threats of eviction though some persisted anyway. Several tenants testified that they did not complain in writing because they believed the eviction threats of Brandvold and they did not possess the financial resources to move their trailers on short notice.

Out of desperation the tenants eventually began to complain to the Health Department because of the inaction of the landlords and Brandvold. Out of concern for their health and safety, the tenants formed a tenants' union in August of 1985 and elected a spokesperson. On August 13, 1985 the spokesperson/tenant received an eviction notice. Also in August, the landlords attempted to have the tenants sign a written rental agreement; all refused

3

primarily due to a clause in the agreement that stated the premises were in a safe and tenantable condition.

After the Health Department became involved at various points, the landlords were instructed to hook into the Missoula County sewer system due to the severity of the septic system problems and water contamination. To accomplish this endeavor, landlords evicted the tenants all of whom were out of the trailer court by July 1986.

This matter came to trial in 1991 on the 9th, 10th and 24th of April and the District Court ruled in favor of the landlords, stating that they did not breach the warranty of habitability in maintaining the trailer court. Tenants appeal and we reverse.

We address only the following dispositive issue on appeal: whether the District Court erred in deciding that the landlords did not breach the warranty of habitability.

We utilize the "clearly erroneous" standard for reviewing findings of fact. Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474, 803 P.2d 601, 603. To determine whether a finding is clearly erroneous we have adopted the following three-part test:

> First, the Court will review the record to see if the findings are supported by substantial evidence. Second, if the findings are supported by substantial evidence we will determine if the trial court has misapprehended the effect of evidence. [Citing cases.] Third, if substantial evidence exists and the effect of the evidence has not been misapprehended, the Court may still find that "[A] finding is 'clearly erroneous' when, although there is evidence to support it, a review of the record leaves the court with the definite and firm conviction that a mistake has been committed." [Citing cases.]

Interstate Prod. Credit Ass'n v. DeSaye (1991), 250 Mont. 320, 323,

4

820 P.2d 1285, 1287.

Montana enacted "The Montana Residential Landlord and Tenant Act" (the Act) in 1977. Sections 70-24-101, MCA et seq. The purpose of the Act is to: "(a) simplify, clarify, modernize, and revise the law governing the rental of dwelling units and the rights and obligations of landlords and tenants; and (b) encourage landlords and tenants to maintain and improve the quality of housing." Section 70-24-102, MCA. The term "dwelling unit" is defined by § 70-24-103(3), MCA, to include "a person who rents space in a mobile home park," making the Act applicable in the case at bar. The Act utilizes "good faith" or "honesty in fact" as the standard in dealings and transactions between the parties. Section 70-24-103(4), MCA.

Also instructive in the case at bar are various Administrative Rules of Montana including: 16.10.706-Water Supply, 16.10.707-Sewage System, 16.10.710-Solid Waste--Storage and Disposal, 16.10.714-Operator Requirements.

It is with guidance from these sources that we address the issue of habitability; intimately intertwined with the habitability issue is the aspect of "notice" to the landlords of the problems the tenants experienced. Therefore, for clarity, we first address informationally the topic of "notice" in the case at bar before proceeding to the dispositive issue of habitability.

The landlords argue that they were never notified nor were they aware of the conditions so that they could repair or replace the problem. This argument is not supported by the record.

5

Brandvold, as manager of the trailer court, lived in the trailer court and, if he did not observe the debris and odors in and about the trailer court, he most certainly should have. Since Brandvold is the agent of the landlords, they must be charged with having notice of the defects and conditions on the premises.

The landlords continue with this illogical argument in reliance on § 70-24-406, MCA, which provides that the tenant is to notify the landlord in writing of any problems. We believe that the legislature adopted the "in writing" portion of the statute to deter tenants from claiming that they gave notice to the landlord when they had not. The "in writing" requirement is to assure that the landlord was given notice and the opportunity to correct the problem. The case at bar is not one of these cases. As stated previously, Brandvold lived at the facility and witnessed the defects and problems first hand; he obviously had actual notice of all the aforementioned problems. The Health Department was also involved on various occasions relating to the unsanitary sewage and water conditions of the trailer court. The testimony of one of the owners, Harold Magruder (Magruder) is riddled with the words "I don't recall" when asked for any specificity or detail on almost any issue. He was particularly elusive about the notice issue and even went so far as to state repeatedly that he was not aware of the complaints because they were not in writing due to Brandvold's failure to relate the complaints to him.

Later, Magruder reluctantly conceded that he was aware of some of the problems and that eight of the tenants were complaining.

6

Further, Magruder testified that he did get written notice from the

Health Department about the condition of the trailer court:

Q. Clean and safe. Was it [the trailer court] clean according to the pictures of the refuse piled around all of the dumpsters?

A. Well, if that -- those pictures coincided with the date of the rental agreement, no.

Q. Wasn't the water unsafe in August of 1985? Wasn't there a boil order in effect?

A. If that's what it [the letters from the Missoula County Health Department] says, yes.

Q. And didn't Mr. Kikkert [the County's environmental health specialist], several times, say that there were serious sanitary problems going on at the trailer court?

A. Just that one mention in that one here.

Q. Well, I recall three letters by Mr. Kikkert indicating that there were sanitation problems there.

A. Caps.

Q. That's not exactly what he said. Didn't he talk about serious health hazards? Do you want to look at the exhibits again?

Magruder's testimony is fraught with inconsistencies; after

claiming that he had no knowledge of the problems he then testified

that the sewer repair people were out at the trailer court trying

to fix the problems on a daily basis. Magruder also attempts to

create yet another escape route stating that he told Brandvold to

tell the tenants that if they had a serious complaint they should

bypass Brandvold and speak directly with the owners.

We find it particularly egregious that the landlords then,

with knowledge of the many problems, would present for the tenants'

signatures the lease agreement containing a statement of condition

7

which was untrue, let alone emphasize that the tenants refused to sign the new lease as some example of their uncooperativeness. The clause read as follows:

> 8. Condition: Lessee agrees and stipulates that Lessee has examined the premises, including the grounds, buildings, and improvements, and that they are, at the time of this rental agreement, in good order and repair, and in a safe, clean and tenantable condition.

Under these circumstances, we will not allow the landlords to escape their responsibility by claiming that they were never notified. There was actual notice under § 70-24-108, MCA.

In directly addressing the habitability issue, we note that a major but absent character in this lawsuit is Brandvold. He was the on-site manager of the trailer court and, in theory, the conduit through which all information traveled between landlords and tenants. The record indicates that Brandvold was not accountable to either the tenants or the landlords in almost every action that took place. Brandvold also violated his own rule of "no junk vehicles in the trailer court" by himself repairing, dismantling and parking vehicles in various stages of disrepair at the trailer court site. A careful review of the record also indicates that due to the recurring nature of the problems and the fact that Brandvold did little or nothing about the complaints, the tenants obviously felt a sense of futility, many of them indicating that making a complaint to him was in vain. Further, when tenants did complain many of them testified that they were met with threats of eviction from Brandvold.

While we sympathize with the landlords' apparent misfortune in

8

relying on a manager who only paid "lip service" to their instructions and directives, they still must be held accountable for his actions or inactions. In this light, we note that Magruder also testified that he hired Brandvold without knowing his employment history or taking an application for employment from him.

> Q. Okay. And you hired Mr. Brandvold then as the trailer court manager.
>
> A. Yes.
>
> Q. What did you know about Mr. Brandvold?
>
> A. Not a great deal.
>
> Q. And is that -- has something to do with the fact that you can't find him? Did you ever get an employment history from him?
>
> A. No.
>
> Q. Take an application from him.
>
> A. No. We just talked to him.

Citing the fact that the trailer court license was never revoked by the Health Department, the landlords characterize the conditions that the tenants complained of as "inconveniences." However, raw sewage spilling onto the ground next to one's dwelling, with its repugnant odors and health concerns, cannot appropriately be described as merely an "inconvenience" nor can unsafe drinking water be placed into that category. These issues go directly to the habitability of the trailer court and no amount of creative verbiage can subvert the conclusion that the trailer court was not in a habitable condition.

With regard to the contamination of the water at the trailer

9

court, the environmental health specialist Douglas Kikkert (Kikkert), said that he was not sure of the source of contamination. Further, trailer court tenant Mrs. Amundson, and other tenants, testified that they were never notified by landlords that the boil order was lifted and that they could resume normal consumption of the water. This fact was corroborated by Magruder when he yet again assigned responsibility to Brandvold for not informing the tenants that the boil order was lifted.

Numerous witnesses testified to the unhabitable condition of the trailer court. Ms. Cora Linn resided in the trailer court from May 1985 to June 1986 and her testimony is particularly illustrative.

Q. What was the condition of the trailer court at the time that you first moved into it?

A. It was a mess.

Q. Could you describe the -- what you mean by the word "mess?"

A. Raw sewage. Toilet paper. Uncapped sewers. Open well hole full of water around a child's trailer. Yes, it was a mess.

. . .

Q. What kind of problems did you have?

A. Right by my front door was a hole by a tree, and it was raw sewage and fumes that made me sick . . . the hole was about a half a foot wide when I moved in. When I left it was a foot wide, and it was nasty.

. . .

Q. . . . Now this sewage backing up, could you tell where it was coming from?

A. From down in the ground past the tree trunks. It was just there.

Q. There was no pipe there that you could see.

A. I couldn't see nothing but a hole.

Q. Did you mention that particular problem to Mr. Brandvold?

A. Yes.

Q. And what did he tell you?

A. Ha, ha, ha. [To] put dirt on it.

Q. And did you do that?

A. Yes.

Q. And what was the result?

A. The hole got bigger.

Q. How often would you have to fill that hole with dirt?

A. Once every month . . . it grew an inch, inch and a half, each time you filled it up.

Q. Okay. How deep was it?

A. Deep. I could put a stick in it and come up this deep with it. I don't know how much that would be.

Q. You indicated about maybe more than a foot.

A. More.

Q. Okay. And to whom did you complain about that sewer problem?

A. To the manager [Brandvold].

Q. And his response was what?

A. Ha. Put dirt in it. It will dry up.

. . .

Q. Were there any other dangerous conditions at the trailer court?

A. Yes, that little dot right in the top up there was open.

11

Q. You're referring to the main sewer riser.

A. That's right. And there was a little baby hanging over the edge, and I got that baby, took him in his trailer. I went down to the manager and I said, "Cover this, or I'm going to the police." He said, "Bitch all the way down there." He put a piece of board and a rock, and he said, "Don't bother me no more. I don't care who dies."

. . .

Q. You had complaints, Ms. Linn, about the odor and the appearance of the sewage. The sewage disposal system, the drains, and toilets in your trailer worked for the entire 14 months that you lived there, did they not?

A. No.

Q. Were they stopped at some point?

A. They backed up a lot. I had --

Q. How many times?

A. I counted six times I had to use snakes to unplug my toilet so I could flush it. When I did it came out of the ground on the other side of the lot.

Also, tenant Richard Schwarz testified that "[o]ne day the sewage backed up to the point to where it came up through my bathtub lines, all the way underneath my trailer, and came up and knocked my bottom pipe down, and it was squirting out of the ground behind my trailer." The extent of Brandvold's attempt to correct the problem was that he threw lime underneath Schwarz's trailer. A similar rendition was testified to by Dorienne Amundson as follows:

Q. Okay. Were you present in the trailer court when Richard Schwarz's neighboring vacant lot bubbled up with sewage?

A. Yes, I was.

Q. And what steps did Brandvold take to alleviate that

12

situation?

A. He threw lime on it.

Q. Did he do any cleanup of the place?

A. None.

Q. How about all those sewer risers in Exhibits 5, 6, and 7? Did he do anything to clean up the garbage that was around it?

A. No. He left it there.

Mr. Greg Filori also testified to the sewage and uncleanliness of the trailer court as follows:

Q. Did you have any problems with the sewage system where you lived in River Road Trailer Court?

A. Yes. There was open pipe by the trailer.

Q. There was an open pipe by the trailer, and what did that do?

A. It kind of seeped up through the ground by the tree. You can smell it.

Q. What seeped up?

A. The sewage.

. . .

Q. Okay. Were the common areas and the grounds around your particular residence where you lived, were they kept in a clean -- clean and safe manner by management?

A. No.

Q. Did they keep the weeds and water puddles and what not removed?

A. There was quite a few weeds there.

. . .

Q. . . . were they [the weeds] ever trimmed or cut back?

A. No.

13

Q. Do you know if the common areas of the trailer court were ever watered or the grass mowed?

A. I didn't see [the grass] mowed.

Garbage services were also problematic when, after constant complaints about the inadequate size of the dumpsters, larger ones were temporarily installed and Brandvold himself filled them with debris from his construction business, which was unrelated to the trailer court.

The landlords also tout that they were never in any violation of health codes as administered by the Health Department. However, we have reviewed the reports and testings made by the Health Department and have discovered the following warning in the reports when the results proved to be "noncontaminated."

> The laboratory examination of this sample showed no evidence of contamination. This indicates that, as far as can be determined by a laboratory examination, the water was safe for drinking at the time the sample was taken. However, these results cannot be relied upon as indicating the safety of the water at all times unless the source is properly located and maintained.
>
> Any well construction which does not positively exclude all surface and subsurface contamination must be considered as dangerous to health. All dust, pump spillage, surface drainage, bird droppings, scrapings from one's shoes, etc. must be prevented from entering the well.

The surface and subsurface contamination of concern and reported by the tenants is exactly the type of contamination named in the warning. Further, the Health Department's employee Kikkert explained more clearly the meaning of water test results in his deposition as follows:

Q. And how about the other one [sample]?

14

A. And the next one, a sample taken by . . . Brandvold shows contamination with no coliform bacteria.

Q. What would that mean?

A. That the particular multiple tube fermentation media was able to grow something, but not coliform bacteria. The laboratory problem there is that whatever's growing may have crowded out what we wanted to test for and the coliform bacteria and not allowed it to grow, so it's marked as no coliform bacteria, but the simple matter may be that another contaminate has crowded it out and not allowed it to show up on our test.

Due to the historical non-attentiveness of Brandvold, the tenants chose not to believe news circulated by word of mouth that the water was once again safe for consumption, particularly when the septic problems had not been alleviated. The tenants logically connected the contaminated water with the sewage leakage and based their actions regarding whether to drink the water again on their own observations.

With this testimony in mind we examine existing case law. First, in Corrigan v. Janney (1981), 192 Mont. 99, 102, 626 P.2d 838, 839, we indicated that by adopting the Residential Landlord and Tenant Act of 1977, there is an implied warranty of habitability present in the landlord/tenant relationship. In Corrigan, the tenants complained to their landlord after moving in that when touching various portions of the plumbing system an electric shock was received. Mr. and Mrs. Corrigan, as well as numerous guests, experienced such shocks and requested that the landlord have the electrical system inspected. It was also shown that the previous tenant moved out because the landlord refused to address the electrical problem. The landlord did nothing

15

throughout the Corrigans' tenancy, which lasted a year or more, until Mr. Corrigan was killed by an electric shock while bathing.

While Corrigan is an example of a severe result from a landlord's failure to maintain rental property in a habitable condition, it bears similarity to the case at bar. There were serious and ongoing problems that went unabated despite the complaints of the tenants. In the case at bar the record indicates that the sewer and water systems were problematic and there were other conditions in the trailer court that were unclean and dangerous. The fact that no one incurred a fatal accident because of the lack of care exhibited by the landlords is irrelevant. The instant case and Corrigan are identical in that the tenants repeatedly made complaints about the unsafe and uninhabitable conditions, all of which were either addressed inadequately or more commonly not at all.

In Busch v. Kammerer (1982), 200 Mont. 130, 649 P.2d 1339, a tenant's only source of domestic water came via a garden hose stretched from a neighboring house above ground. We indicated that such a condition was grounds for a claim against the landlord for a violation of the Residential Landlord and Tenant Act, which, as stated in Corrigan, encompasses an implied warranty of habitability.

Corrigan and Busch perpetuate the purpose and goals of the Residential Landlord and Tenant Act and are helpful by giving us examples of violations of the warranty of habitability.

In the case at bar, the testimony of Magruder is particularly

16

revealing with regard to his true expectations of Brandvold in maintaining or repairing the trailer court.

> Q. And yet you expected him to handle all of the business of the River Road Trailer Court.
>
> A. Oh, no.
>
> Q. The majority of it?
>
> A. Just collecting the rent, and keeping the weeds cut down.

The examples in Corrigan and Busch are similar to the case at bar and we conclude that the landlords breached the warranty of habitability.

In reviewing the case at bar we also note the District Court's inconsistent treatment of the habitability issue. For instance, in the court's findings of fact and conclusions of law that spanned 26 pages, the court said:

> The Court specifically finds that the River Road Trailer Court was not clean nor were the grounds, buildings and improvement[s] steadily in good order and repair.

Also the court found that the landlords failed to engage in cleanup activity after tenants vacated the premises, yet the court ruled in favor of the landlords and stated that the landlords met their duty to maintain the premises, and that they took steps to remedy the problems.

Also, after the court recited the condition of the trailer court and the ongoing nature of the problems, it used the adjectives "inconvenienced" and "discomfort" to describe what these tenants experienced. As mentioned previously the record does not support this characterization.

17

The tenants in the case at bar contended with ongoing serious violations of habitability standards few of which were addressed by the landlords in a timely manner, if at all. After reviewing the record we are left with the definite and firm conviction that a mistake has been committed under the third prong of the three-part test we adopted in DeSaye, 250 Mont. at 323, 820 P.2d at 1287, when the District Court determined that the landlords did not breach the warranty of habitability. We conclude that the landlords failed to adequately maintain the trailer court in a habitable manner and breached the warranty of habitability. Therefore, we reverse and remand to the District Court for further proceedings consistent with this opinion. Reversed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

18

August 18, 1992

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Klaus D. Sitte
Montana Legal Services Association
127 East Main, Room 209
Missoula, MT 59802

Christopher B. Swartley
DATSOPOULOS, MacDONALD & LIND, P.C.
201 West Main, Suite 201
Missoula, MT 59802

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy